1   GREGORY R. OXFORD (S.B. #62333)
    goxford@icclawfirm.com
2   ISAACS CLOUSE CROSE & OXFORD LLP
    21515 Hawthorne Boulevard, Suite 950
3   Torrance, California 90503
    Telephone:   (310) 316-1990
4   Facsimile:    (310) 316-1330

5   PHILIP E. HOLLADAY, JR. (*Pro Hac Vice*)
    pholladay@kslaw.com
6   ROBERT B. FRIEDMAN (*Pro Hac Vice*)
    rfriedman@kslaw.com
7   KING & SPALDING LLP
    1180 Peachtree Street, NE
8   Atlanta, GA 30309
    Telephone: (404) 572-4600
9   Facsimile: (404) 572-5100

10   Attorneys for Defendant
    General Motors LLC

11

12             **UNITED STATES DISTRICT COURT**

13            **CENTRAL DISTRICT OF CALIFORNIA**

14                **WESTERN DIVISION**

15

16   GRANITE STATE INSURANCE      Case No: 2:11 CV-02611-CAS-AJW
    COMPANY, a Pennsylvania
17   corporation, and FEDERAL         **DEFENDANT GENERAL MOTORS**
    INSURANCE COMPANY, an         **LLC'S MEMORANDUM OF POINTS**
18   Indiana corporation,                 **AND AUTHORITIES IN SUPPORT**
                                      **OF MOTION FOR SUMMARY**
19             Plaintiffs,            **JUDGMENT [Fed. R. Civ. P. 56]**

20               vs.                 Hearing Date:   September 10, 2012
                                   Time:               10:00 a.m.
21   GENERAL MOTORS LLC, a        Courtroom 5
    limited liability company           Hon. Christina A. Snyder
22

23            Defendant.        Complaint Filed: March 29, 2011
                                   Trial Date:      October 9, 2012

24

25       Defendant General Motors LLC ("New GM") respectfully submits this

26 memorandum in support of its motion for summary judgment on all claims for

27 relief pleaded in the complaint ("Compl.") of plaintiffs Granite State Insurance

28 Company ("Granite State") and Federal Insurance Company ("Federal").

**TABLE OF CONTENTS**

**INTRODUCTION**                                                                1

**FACTUAL BACKGROUND**                                                          3

    **I.**     **The *Deutsch* Lawsuit**                                    3

    **II.**    **The Dealer Agreement**                                      4

    **III.**   **The Settlement of *Deutsch* by Renick's Insurers**          5

    **IV.**   **The Bankruptcy Sale**                                       8

**STANDARD FOR SUMMARY JUDGMENT**                                               9

**CHOICE OF LAW**                                                               9

**ARGUMENT**                                                                    11

**I.**   **Neither Old GM nor New GM Breached the Dealer Agreement**          11

    **A.**    **Old GM fulfilled its obligations under the Dealer Agreement**   11

    **B.**    **The Dealer Agreement imposes no duty to settle claims or to indemnify the Dealer – let alone its insurers -- for settlements**   12

**II.**  **Plaintiffs' "Express Indemnity" Claim Similarly Fails Because the Indemnification Provision Does Not Cover Settlements**   15

**III.** **Plaintiffs Have No Standing to Pursue a Claim Based on Breach of Contract or Express Indemnity**   17

**IV.** **New GM is Entitled to Summary Judgment on Plaintiffs' Equitable Subrogation Claims**   18

**CONCLUSION**                                                                  20

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Addisu v. Fred Meyer*,
    198 F.3d 1130 (9th Cir. 2000) ............................................................... 9

*American Fellowship Mut. Ins. Co. v. Ins. Co. of N.A.*,
    90 Mich. App. 633, 282 N.W.2d 425 (1979) ....................................... 13

*Auto-Owners Ins. Co. v. Amoco Prod. Co.*,
    468 Mich. 53, 658 N.W.2d 460 (2003) ................................................ 19

*Badiee v. Brighton Area Schs.*,
    265 Mich. App. 343, 695 N.W.2d 521 (2005) ..................................... 12

*Burkhardt v. Bailey*,
    260 Mich. App. 636, 680 N.W.2d 453 (2004) .................................. 10,13

*CAZA Drilling (Ca.), Inc. v. TEG Oil & Gas U.S.A., Inc.*,
    142 Cal. App. 4th 453, 48 Cal. Rptr. 3d 271 (2006) ............................. 9

*Celotex Corp. v. Catrett*,
    477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ...................... 9

*Crain v. Burroughs Corp.*,
    560 F.Supp. 849 (C.D. Cal. 1983) ....................................................... 14

*Crossen v. Foremost-McKesson, Inc.*,
    537 F.Supp 1076 (N.D. Cal. 1982) ...................................................... 14

*Detroit Edison Co. v. City of Detroit*,
    No. 278778, 2009 Mich. App. LEXIS 1441 (June 25, 2009) ............... 16

*Detroit Sch. Dist. v. URS Corp.*,
    No. 267715, 2006 Mich. App. LEXIS 2398 (July 27, 2006) ............... 18

*Foley v. Railway Co.*,
    168 Mich. 496, 134 N.W. 446 (1912) .................................................. 17

*Gartside v. Young Men's Christian Ass'n*,
    87 Mich. App. 335, 274 N.W.2d 58 (1978) ......................................... 16

ii

*Grand Trunk W.R.R., Inc. v. Auto Warehousing Co.*,

    262 Mich. App. 345, 686 N.W.2d 756 (2004)           15,16

*Interstate Fire & Cas. Ins. Co. v. Cleveland Wrecking Co.*,

    182 Cal. App. 4th 23, 105 Cal. Rptr. 3d 606 (2010)     20

*Liberty Mut. Ins. Co. v. Curtis Noll Corp.*,

    112 Mich. App. 182, 315 N.W.2d 890 (1982)     16

*Martin v. City of E. Lansing*,

    249 Mich. App. 288, 642 N.W.2d 700 (2001)     13,16

*Mich. Stamping Co. v. Mich. Emp'rs Cas. Co.*,

    235 Mich. 4, 209 N.W. 104 (1926)     12,16,17

*Miller-Davis Co. v. Ahrens Constr., Inc.*,

    No. 284037, 2012 Mich. App. LEXIS 559 (Mar. 22, 2012)     11

*Nedlloyd Lines B.V. v. Superior Court*,

    3 Cal. 4th 459, 11 Cal. Rptr. 2d 330 (1992)     9,10

*New Freedom Mortg. Corp. v. Globe Mortg. Corp.*,

    281 Mich. App. 63, 761 N.W.2d 832 (2008)     13

*Oetting v. Nabil*,

    No. 187692, 1997 Mich. App. LEXIS 3536 (February 14, 1997)     18

*Olinick v. BMG Entm't*,

    138 Cal.App.4th 1286, 42 Cal. Rptr. 3d 268 (2006)     10

*Pierce v. Merrill*,

    128 Cal. 464, 61 P. 64 (1900)     10

*Prince v. Pacific Gas & Elec. Co.*,

    45 Cal. 4th 1151, 90 Cal. Rptr. 2d 732 (2009)     10,15,16

*Raines v. Nat'l Emergency Servs.*,

    No. 189997,1996 Mich. App. LEXIS 506 (Dec. 13, 1996)     15

*Robinson v. A.Z. Shmina & Sons Co.*,

    96 Mich. App. 644, 293 N.W.2d 661 (1980)     16

*Rossmoor Sanitation, Inc. v. Pylon Inc.*,

    13 Cal. 3d 622, 119 Cal. Rptr. 449 (1975)      16

*Schmalfeldt v. N. Pointe Ins. Co.*,

    252 Mich. App. 556, 652 N.W.2d 683 (2002)      18

*Shapiro v. Wells Fargo Realty Advisors*,

    152 Cal. App. 3d 467, 199 Cal. Rptr. 613 (1984)      13

*Shay v. Aldrich*,

    487 Mich. 648, 790 N.W.2d 629 (2010)      18

*Ventura County Employees' Retirement Assoc. v. Pope*,

    87 Cal. App. 3d 938, 151 Cal. Rptr. 695 (1978)      20

*Yerkovich v. AAA*,

    461 Mich. 732, 610 N.W.2d 542 (2000)      18,19

*Zurich Ins. Co. v. CCR and Co.*,

    260 Mich. App. 599, 576 N.W.2d 392 (1997)      10

**Statute and Rule**

California Code of Civil Procedure §998      5

Fed. R. Civ. P. 56(c)      9

iv

## INTRODUCTION

This case turns entirely on the interpretation of a contract:  the Dealer Sales and Service Agreement ("Dealer Agreement") between General Motors Corporation ("Old GM") and its authorized dealership, Renick Cadillac, Inc., ("Renick").  Specifically, in Article 17.4 of the Dealer Agreement, Old GM agreed to defend Renick in a product liability case and indemnify it *for any resulting money judgment*.  Plaintiffs are Renick's insurers, which have sued General Motors LLC ("New GM") to recover money they chose to pay to **settle** the product case against Renick without Old GM's consent or approval – a monetary obligation that the clear indemnification language of Article 17.4 simply does not cover.

All of Plaintiffs' claims, however denominated, require proof that the Dealer Agreement obligated Old GM (and, as a consequence of its bankruptcy-related asset sale, New GM) to either accept the settlement that Old GM did not want to accept or indemnify Granite State and Federal – strangers to the Dealer Agreement – for the settlement that they unilaterally chose to fund on Renick's behalf.

Because the clear language of Article 17.4 of the Dealer Agreement required Old GM to indemnify Renick only for monetary judgments, **not settlements**, Old GM, following the settlement, had no indemnification obligations to Renick or the plaintiff insurance companies as a matter of law.  The same is true of New GM, to which the Dealer Agreement was assigned in a transaction approved by Old GM's Bankruptcy Court **after the plaintiff insurance companies had decided to settle the product liability case**.  Following the assignment, the same contractual provision – Article 17.4 – only obligated New GM to defend Renick (which was no longer necessary since the case had been settled) and to indemnify it for money judgments, **not settlements entered into without its consent**.  Accordingly, and without more, New GM is entitled to judgment as a matter of law.

The indemnification provisions of the Dealer Agreement are very clear.  Once Old GM accepted Renick's request to defend the product liability case, Old

GM, not Renick, was responsible for 100 percent of any resulting judgment – whether it exceeded the policy limits of Renick's insurance or not.  Since Old GM was "playing with its own money," and had an obvious interest in obtaining and retaining control over product liability litigation involving GM vehicles,[1] Old GM was entitled to decide on its own whether to defend or settle the underlying claim. It decided, as the Dealer Agreement clearly entitled it to do, to reject the proposed $6 million settlement and defend the claim.  The plaintiff insurance companies elected to override that decision as to Renick, and the responsibility for doing so now rests solely with them.

In an attempt to squirm out of that position, and contrary to well-established principles of contract interpretation, Renick's insurers now want to go ***outside*** the four corners of the Dealer Agreement and have the Court imply an agreement by Old GM to accept the $6 million settlement offer based on the possibility of a bankruptcy filing by Old GM.  Any such implied agreement, however, would clash frontally with the language of the Dealer Agreement that placed the decision to settle, or not, squarely with Old GM.  That Old GM might file for bankruptcy did not alter or augment Old GM's obligations under the Dealer Agreement – obligations that did not include the duty to indemnify the plaintiff insurance companies for a settlement that they chose to pay for their own reasons.

To be sure, the insurers claim that the spectre of a possible bankruptcy filing created a dilemma based on their fear of a bad faith action by Renick if (as did not occur) Old GM after filing bankruptcy were to forswear its obligations under Article 17.4 and an ultimate judgment against the dealership exceeded the $6 million policy limits and the value of Renick's unsecured bankruptcy claim against Old GM for indemnity (to which plaintiffs would be subrogated).  But that fear

---

[1]  Excessive settlements, other things being equal, encourage additional claims and embolden existing and future claimants to seek higher settlements, to say nothing of the immediate adverse economic impact of the settlement itself.

2

placed the insurers in no worse position than any creditor in a potential bankruptcy. Lots of people are harmed by bankruptcy.  The plaintiff insurers – which would have been indirect subrogated creditors of Old GM if they had had to pay an excess judgment – have no right to improve their position vis-à-vis other creditors through the artifice of an indemnity claim against New GM, which did not even exist at the time plaintiffs settled the case and which never agreed to pay for that settlement. Simply put, the insurers have no implied right to lay off their voluntary settlement payments on New GM.

Instead, this case begins and ends with an issue of straightforward contract interpretation, the kind of issue that is especially appropriate for summary disposition.  New GM is entitled to judgment as a matter of law because Article 17.4 simply does not cover independent settlements by a dealer's insurers.

## **FACTUAL BACKGROUND**

### I.   **The *Deutsch* Lawsuit**

This dispute arises out of plaintiffs' decision to settle a lawsuit against Renick arising from an automobile accident.  Renick leased a 2006 Cadillac DTS to Beverly Deutsch.   On June 27, 2007, she drove it into the back of a Los Angeles Metro Transit Authority bus.  (*See* Compl. ¶10.)  She and her husband Sanford (the "*Deutsch* Plaintiffs") filed a product liability lawsuit in April 2008 in California state court against, among others, Old GM and Renick (the "*Deutsch* Action"). (*See id.* ¶11.)  The *Deutsch* Plaintiffs alleged that, *inter alia*, the Cadillac DTS was defective because its driver's air bag failed to properly deploy and the driver's seat belt failed to properly restrain Mrs. Deutsch.  (*See id.* ¶10.)

On May 5, 2008, Leonard Renick wrote a letter to Old GM requesting that it defend and indemnify Renick in the *Deutsch* Action under the Dealer Agreement between Old GM and Renick.[2] (May 5, 2008 Letter from L. Renick to Old GM, Ex.

---

[2]  The Standard Provisions of the Dealer Agreement, including Article 17.4, are Exhibit A in the accompanying Exhibit Appendix ("Ex. Appx.").

Appx., Ex. B.)  Old GM responded to the request on May 16, 2008, by agreeing to defend and indemnify Renick against a monetary judgment in the *Deutsch* Action pursuant to Article 17.4 of the Dealer Agreement.  Old GM further advised Renick that both Renick and Old GM would be represented by Derek Whitefield of the Dykema Gossett PLLC law firm ("Dykema").  (Compl. at ¶14; May 16, 2008 Letter from D. Brown to L. Renick, Ex. Appx., Ex. C.)

## II.    The Dealer Agreement

Article 17.4 of the Dealer Agreement sets out the circumstances under which Old GM would assume defense of the *Deutsch* Action and, if necessary, indemnify Renick for an adverse judgment:

> General Motors will assume the defense of Dealer and indemnify Dealer against ***any judgment for monetary damages*** or rescission of contract, less any offset recovered by Dealer, in any lawsuit naming Dealer as a defendant relating to any Product that has not been altered when the lawsuit concerns [a defect in the design, manufacture or assembly of a GM automobile or bodily injury caused by any of its component parts].

(Ex. Appx., Ex. A, Art. 17.4 (emphasis added).)  Article 17.4 expressly provides that Old GM has the right, "after accepting the defense to transfer the defense back to the Dealer and withdraw its agreement to indemnify the Dealer," and makes clear that the "obligations assumed by General Motors are limited to those specifically described in this Article [17.4] and in the Service Policies and Procedure Manual" (the "GM Service Manual," pertinent excerpts are in Ex. Appx., Ex. D).  (*Id*.)

The Dealer Agreement does not contain any provision requiring GM to indemnify the Dealer for a settlement.  It speaks only to indemnification for a "judgment for monetary damages."  Settlement is not even mentioned in Article 17.4, and it is mentioned only once in the GM Service Manual, which Article 17.4 incorporates by reference and which provides – in circumstances different from the

4

1  present case – for indemnification for a settlement only if the amount is approved
2  by GM in advance.  That provision reads:

3       GM may, at its election, agree only to indemnify dealer and require
4       dealer to conduct its own defense.  In the event of such requirement,
5       dealer shall conduct its own defense and the liability of GM will be
6       limited to the out-of-pocket costs of such defense, including reasonable
7       attorneys' fees, together with the amount of any monetary judgment
8       paid by dealer (*or the amount of final settlement paid by dealer if such*
9       *amount was approved in advance by GM*) provided GM is promptly
10      notified thereof.

11  (*See* Ex. D at Art. 7.1.2(e) (emphasis added).)

12      Other important provisions of the Dealer Agreement provide that the
13  agreement is governed by Michigan law (Article 17.12) and that it does not create
14  any third-party beneficiary rights (Article 17.9).  (*See* Ex. A.)

15      GM's May 16, 2008 letter to Renick expressly stated that GM was only
16  agreeing to indemnify against a judgment for monetary damages, specifically
17  reserved Old GM's right to withdraw its agreement to indemnify and to tender the
18  defense back to Renick, and specifically incorporated the "Indemnification
19  Limitations provisions of the [GM Service] Manual," set out above.  (See Ex. C.)

20  **III.    The Settlement of *Deutsch* by Renick's Insurers**

21      Old GM, through Dykema, defended Renick in the *Deutsch* Action through
22  June 1, 2009 (the date that the plaintiff insurance companies agreed to settle the
23  case).  (Compl. ¶58.)  During discovery in the *Deutsch* Action, Renick had
24  disclosed that it had a $1 million primary insurance policy with Granite State and a
25  $5 million excess liability policy with Federal.  On December 11, 2008, using the
26  possibility of an Old GM bankruptcy as leverage, the Deutsches' counsel made the
27  first of several $6 million policy limits demands on Renick under California Code
28  of Civil Procedure §998; this demand was for settlement of the claims only against

DMSLIBRARY01-19281046.1

Renick (*i.e.*, it did not include settlement of the product liability claims against Old GM).  (Compl. at ¶17; Ex. G to Compl. (Ex. Appx., Ex. E).)  No similar demand was ever made on Old GM.  By statute, the demand to Renick was to remain open until January 10, 2009.  (*See* Ex. E.)

Because the possibility that Old GM might file for bankruptcy had been raised, Old GM's and Renick's joint counsel, Mr. Whitefield, identified a potential conflict of interest that prevented him from giving any advice regarding Renick's response to the initial $6 million settlement demand in December 2008.  (April 3, 2012 Deposition of Derek Whitefield ("D. Whitefield Dep.") at 187-88, Ex. Appx., Ex. F.)  He appropriately disclosed that potential conflict and advised Renick to seek advice from independent counsel about how to respond to the Deutsches' policy limits demand.  (*See id.*)[3]

On December 29, 2008, Mr. Whitefield, in response to plaintiffs' requests, sent two case evaluations he had previously prepared and other case related materials to Douglas Rothman of Chubb Insurance Group (Federal's parent company) and to lawyers representing Granite State.  (December 29, 2008 e-mail from D. Whitefield to D. Rothman, Ex. Appx., Ex. G.)  The more recent of the two case evaluations, a letter dated September 8, 2008, shows that Dykema had "previously recommended exploring the possibility of settlement with plaintiffs *in the range of six figures*," and this letter did not alter the prior recommendation. (*See* Ex. E to Compl.)  Renick and its insurers allowed the December 11, 2008 statutory settlement demand to expire without responding to it.

The Deutsches renewed their settlement demand in February 2009, giving Renick two weeks to accept the $6 million demand.  (February 18, 2009 Letter from B. Novack to D. Whitefield, Ex. Appx., Ex. H.)  Once again, Mr. Whitefield

---

[3] Mr. Whitefield similarly advised Old GM that he likewise could not advise it regarding the settlement demand made on Renick. (D. Whitefield Dep. at 212-13, Ex. Appx., Ex. F.)

DMSLIBRARY01-19281046.1

wrote Renick (this time copying Renick's insurers and the insurers' lawyers) advising that he could not provide the dealership with advice in connection with this demand.  (April 5, 2012 Deposition of Leonard Renick at 88-90, Ex. Appx., Ex. I.)  The insurers again let the demand expire without any response.

On May 26, 2009, the Deutsches' lawyer wrote directly to Renick's long-time corporate counsel, David Ward, who had become involved in the *Deutsch* Action on Renick's behalf, and advised him that the $6 million policy limits demand would be made one last time and remain open until 5:00 p.m. on June 1, 2009. (*See* May 26, 2009 Letter from B. Novack to D. Ward, Ex. Appx., Ex. J; Compl. ¶19.)  Mr. Ward forwarded the letter to Dykema and to the lawyers for both of the insurers that same day, urging that the parties "protect the Dealership."  (May 26, 2009 E-mail with attached letter from D. Ward to A. Clarke, D. Rothman, D. Whitefield, Ex. Appx., Ex. K.)

After receiving the May 26, 2009 letter from Ward, Federal's Mr. Rothman sent Mr. Whitefield an e-mail demanding that Old GM agree to settle the case for $6 million, the amount of the Deutsches' policy limits demand.  (*See* Compl. ¶20.)  On May 27, Mr. Whitefield sent Mr. Rothman an e-mail unequivocally advising that "GM is not paying anything on anyone's behalf."  (May 27, 2009 E-mail string beginning with D. Rothman to D. Whitefield, Ex. Appx., Ex. L.)  Shortly thereafter, Mr. Whitefield had a conversation with Mr. Rothman in which Mr. Whitefield reiterated that GM "***does not want to make any offer at this time***." (May 29, 2009 E-mail from D. Rothman to C. Short, Ex. Appx., Ex. M.) (emphasis added).

On June 1, 2009, without ever contacting plaintiffs' counsel to try and extend the 5:00 p.m. deadline, Granite State and Federal agreed to pay their policy limits of $1 million and $5 million, respectively, to settle the Deutsches' claims against the Renick dealership.  (Compl. at ¶22.)  At no time prior to or on June 1 did Old GM approve the $6 million settlement amount.  In fact, Old GM never agreed to settle on Renick's behalf for ***any*** amount.  (*See* Compl. ¶21.)  Moreover, despite being

7

1  aware that Old GM did not value the case against Renick anywhere close to $6

2  million, the insurers never made an attempt to negotiate the settlement amount with

3  plaintiffs' counsel – from the time demand was first made in December 2008, up

4  until they agreed to pay the full policy limits demand on June 1, 2009.

5      Old GM filed a voluntary petition for bankruptcy in the United States

6  Bankruptcy Court for the Southern District of New York on June 1, 2009.  (*See*

7  Compl. ¶23.)  On the same day, Old GM sent to Renick by overnight Federal

8  Express a letter in which the dealership was given the opportunity to continue on as

9  a GM dealer pursuant to a "Participation Agreement" (the "Renick Participation

10  Agreement," Ex. Appx., Ex. N).  (Compl. ¶24.)  The letter also informed Renick

11  that Old GM and, if the bankruptcy went according to plan, New GM, would

12  continue to defend and indemnify dealerships against monetary judgments under

13  Section 17.4 of the Dealer Agreement.  (Ex. N, §6(c).)

14      The next day, June 2, 2009, Mr. Whitefield sent a letter to Renick, copying

15  Renick's independent counsel and Renick's insurers and their counsel, stating that,

16  due to the insurers' settlement of the claim against Renick, Dykema was

17  withdrawing as Renick's counsel and that Old GM was re-tendering Renick's

18  defense and withdrawing its May 16, 2008 letter whereby it had agreed to defend

19  and indemnify the dealership.  (Compl. ¶25; June 2, 2009 Letter from D. Whitefield

20  to L. Renick, Ex. Appx., Ex. O.)

21      Renick executed the Participation Agreement to continue as a GM authorized

22  dealership on June 10, 2009.  (Ex. Appx. Ex. N.)

23  **IV.  <u>The Bankruptcy Sale</u>**

24      On July 10, 2009, as part of the bankruptcy proceedings, a newly formed

25  entity that is now known as General Motors LLC ("New GM"), purchased certain

26  of Old GM's assets.  (Compl. ¶28.)  The Renick Dealer and Participation

27  Agreements were among the assets that New GM purchased.  (Bankruptcy Court's

28  Decision and Order, Ex. Appx., Ex. P.)

8

1  Granite State and Federal subsequently requested indemnification from New
2  GM – which did not even exist on June 1, 2009 – for the amounts they had agreed
3  to pay on that date to settle the *Deutsch* Plaintiffs' claims against Renick.  (Compl.
4  ¶36.)  When New GM refused, plaintiffs filed this lawsuit. (*See* Compl. ¶39.)

## STANDARD FOR SUMMARY JUDGMENT

6  Summary judgment should be granted if there are no genuine issues of
7  material fact and the moving party is entitled to judgment as a matter of law.  Fed.
8  R. Civ. P. 56(c).[4]  Contract interpretation is a legal issue that may and should be
9  resolved by the Court as a matter of law.  *CAZA Drilling (Ca.), Inc. v. TEG Oil &*
10  *Gas U.S.A., Inc.*, 142 Cal. App. 4th 453, 464, 48 Cal. Rptr. 3d 271, 279 (2006).  All
11  of the plaintiff insurers' claims turn on the contract between Old GM and Renick
12  and therefore may and should be decided by this Court as a matter of law.

## CHOICE OF LAW

14  As a threshold matter, the Court must determine which state's law applies in
15  this proceeding.  The Dealer Agreement between Renick and Old GM contains a
16  clear and unequivocal choice-of-law provision invoking Michigan law:  "This
17  agreement is governed by the laws of the State of Michigan."  (Ex. A at Art. 17.12.)
18  California law not only permits parties to choose the state's law that governs their
19  agreement, but indeed strongly favors contractual choice-of-law provisions.  *See*
20  *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 464, 11 Cal. Rptr. 2d 330,
21  332-33 (1992).  As long as the state named has a substantial relationship to the
22  parties or transaction (or there exists some other reasonable basis for the parties'
23  choice of law) and the chosen state's law is not contrary to a *fundamental* policy of

---

25  [4]  A genuine issue of material fact must be more than a scintilla of evidence, or
26  evidence that is merely colorable or not significantly probative. *Addisu v. Fred Meyer*, 198 F.3d 1130, 1134 (9th Cir. 2000).  Courts will grant summary judgment
27  if, upon a motion, a party fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will
28  bear the burden of proof at trial.

9

California, California courts will enforce the parties' choice of law.  *Id.* at 466, 11 Cal. Rptr. 2d at 334.

Michigan law applies to all of plaintiffs' claims because they all turn on the interpretation of the Dealer Agreement.  *Id.* at 468-69, 11 Cal. Rptr. 2d at 336 (an agreement's choice-of-law clause applies to "all causes of action arising from or related to that agreement, regardless of how they are characterized"); *Olinick v. BMG Entm't*, 138 Cal.App.4th 1286, 1300, 42 Cal. Rptr. 3d 268, 279 (2006) (choice-of-law clause applies to claims that are "inextricably intertwined with the construction and enforcement" of the contract).

There are no significant, let alone fundamental, differences between the applicable law of Michigan and California.  For example, both states require courts to strictly construe the language of a contract that is clear and unambiguous. *Compare*, *e.g.*, *Burkhardt v. Bailey*, 260 Mich. App. 636, 656-57, 680 N.W.2d 453, 464 (2004) ("But when the language of a document is clear and unambiguous, interpretation is limited to the actual words used, and parol evidence is inadmissible to prove a different intent.  An unambiguous contract must be enforced according to its terms.") (internal citations omitted), *with Pierce v. Merrill*, 128 Cal. 464, 470, 61 P. 64, 66 (1900) ("Where the terms are plain and certain . . . the court will be guided by the language used and construe the intention of the parties to have been in accordance with their agreement").

Additionally, both states construe express indemnity contracts according to the general rules of contract construction.  *Compare Zurich Ins. Co. v. CCR and Co.*, 260 Mich. App. 599, 603-04, 576 N.W.2d 392, 395 (1997), *with Prince v. Pacific Gas & Elec. Co.*, 45 Cal. 4th 1151, 1158, 90 Cal. Rptr. 2d 732, 737 (2009) ("Express indemnity generally is not subject to equitable considerations…; rather, *it is enforced in accordance with the terms of the contracting parties' agreement*").

Accordingly, if it matters, Michigan law applies to this dispute, although California law appears to be no different.

10

# ARGUMENT

## I.    Neither Old GM nor New GM Breached the Dealer Agreement.

A party claiming a breach of contract must establish by a preponderance of evidence that (1) there was a contract, (2) the other party breached the contract, and (3) the party asserting breach of contract suffered damages as a result of the breach. *Miller-Davis Co. v. Ahrens Constr., Inc.*, No. 284037, 2012 Mich. App. LEXIS 559 (Mar. 22, 2012).  Plaintiffs allege that New GM – which did not exist when the insurers decided to settle the claims against Renick – somehow breached the Dealer Agreement as a result of Old GM's refusal to pay the settlement amount on behalf of Renick to settle the *Deutsch* Action, and Old GM's subsequent withdrawal of its agreement to defend Renick after the dealer's insurers, on their own volition, decided to settle the case against the dealership.  Compl. ¶¶ 60, 64.  Plaintiffs' claims fail because the Dealer Agreement imposed no duty on Old GM to settle the claims against Renick or to indemnify Renick or its insurers for the settlement the insurers had elected to make for their own purposes.

### A.    Old GM fulfilled its obligations under the Dealer Agreement.

By letter dated May 16, 2008, Old GM agreed to defend and indemnify Renick against any monetary judgment in the *Deutsch* Action.  As required, Old GM provided Renick with representation by the Dykema firm.  There can be no dispute that Old GM and Dykema continued to vigorously defend Renick against the merits of the claims asserted against the dealership in the *Deutsch* Action until Renick's insurers unilaterally decided to accept the policy limits demand of the *Deutsch* Plaintiffs.  In fact, the plaintiff insurers admit in their Complaint that New GM "provided a defense to Renick until June 1, 2009."  Compl. ¶58.  At no time prior to the insurers' settlement of the claims did Old GM ever communicate to Renick that it did not intend to continue to defend and indemnify the dealership pursuant to the Dealer Agreement.

11

It was not until **after** the plaintiff insurers agreed to settle the *Deutsch* Action on June 1, 2009, that the Dykema firm advised Renick that it would not be able to continue to represent it, and Old GM re-tendered the defense.  Old GM and Dykema took such action because, following the settlement, there was no longer a claim to defend.  Old GM also had the right to withdraw its agreement to indemnify Renick against monetary judgments because there was not going to be one.

**B.      The Dealer Agreement imposes no duty to settle claims or to indemnify the Dealer – let alone its insurers -- for settlements.**

New GM admits that under Article 17.4 of the Dealer Agreement, Old GM had a duty to defend Renick and indemnify it for any monetary judgment based on claims involving a product defect.  Old GM did not, however, have any duty to settle claims on behalf of Renick, regardless of whether Renick's insurers or the dealership believed the settlement offer to be reasonable.  Old GM similarly had no duty to reimburse Renick's insurers for paying a settlement that Old GM did not approve in advance.

Not only are these obligations absent from the Dealer Agreement, but they are logically inconsistent with a manufacturer's strong interest in controlling the course and outcome of litigation in which a product defect is alleged.  As noted above, once Old GM accepted Renick's indemnification request, it was "playing with its own money," and was entitled to make the decision to defend or settle the litigation.  Article 17.4 clearly was intended to give GM control over litigation involving its products – and to evaluate unilaterally and bear the risk that goes with that control if it decided not to settle.

The burden is on plaintiffs to establish that the contract includes the duty on which they base their claims.  *See Mich. Stamping Co. v. Mich. Emp'rs Cas. Co.*, 235 Mich. 4, 14, 209 N.W. 104, 107 (1926).  Under Michigan law, courts construe indemnity contracts in the same manner as contracts generally.  *Badiee v. Brighton Area Schs.*, 265 Mich. App. 343, 351, 695 N.W.2d 521, 531 (2005).  When

12

construing a contract, the goal is to ascertain and enforce the parties' intent on the basis of the plain language of the contract, and, if the terms of a contract are unambiguous, their construction is for the Court to determine as a matter of law. *New Freedom Mortg. Corp. v. Globe Mortg. Corp.*, 281 Mich. App. 63, 75-76, 761 N.W.2d 832, 840 (2008); *Martin v. City of E. Lansing*, 249 Mich. App. 288, 291, 642 N.W.2d 700, 702 (2001); *American Fellowship Mut. Ins. Co. v. Ins. Co. of N.A.*, 90 Mich. App. 633, 636, 282 N.W.2d 425, 427 (1979).  If the contract is clear and unambiguous, the contract must be enforced according to its terms.  *Burkhardt v. Bailey*, 260 Mich. App. at 656-57, 680 N.W.2d at 464.

Plaintiffs can offer no evidence to establish that the Dealer Agreement imposed any duty on Old GM to settle claims on behalf of Renick or to reimburse Renick's insurers for their voluntary settlement payments on behalf of Renick. Plaintiffs' interpretation of the Dealer Agreement – that it *implicitly* requires reimbursement of unapproved settlements – would give dealers and their insurers a "blank check" to settle a case whenever and for whatever amount they pleased. Plaintiffs' claim that GM had such an implicit obligation simply makes no sense: on their theory, GM would have to relinquish control over litigation involving its products, but retain all of the risk, including risk to the dealers' insurers which Article 17.4 nowhere contemplates.  Such an implied contract argument finds no basis in the language of the Dealer Agreement and is anathema to the language and evident purpose of its express indemnification provisions.[5]  California law is especially supportive of this conclusion.  *See Shapiro v. Wells Fargo Realty Advisers*, 152 Cal. App. 3d 467, 482, 199 Cal. Rptr. 613, 622 (1984) ("there cannot

---

[5]  The insurance policies issued by Granite State and Federal similarly provided that the insurers are not responsible for a settlement reached by an insured without its approval.  Federal's Neil Huber, who made the decision to settle on Renick's behalf, testified that the reason for such provision is "to ensure that a policyholder doesn't make a commitment without our consent," . . . "because we want to manage our own exposure."  (Deposition of Neil Huber at 114-15, Ex. Appx., Ex. Q.)

1   be a valid express contract and an implied contract, each embracing the same

2   subject, but requiring different results"); *Crossen v. Foremost-McKesson, Inc.*, 537

3   F.Supp. 1076, 1077 (N.D. Cal. 1982); *Crain v. Burroughs Corp.*, 560 F.Supp. 849,

4   852 (C.D. Cal. 1983).

5          By its plain language, the Dealer Agreement only imposed a duty on Old GM

6   to defend and pay monetary judgments, not to fund unilateral settlements made by

7   the dealer or its insurers.  Old GM's obligations in this regard were fully and clearly

8   set forth in Article 17.4 of the Renick Dealer Agreement:  "General Motors will

9   assume the defense of Dealer and indemnify Dealer against any ***judgment*** for

10  monetary damages or rescission of contract" under certain circumstances.

11  (Emphasis added.)  This clear and unambiguous provision, which was specifically

12  cited in Mr. Brown's letter agreeing to defend Renick, must be enforced according

13  to its terms.

14         To the extent the agreement between Renick and Old GM addresses

15  settlement at all, it is in the limited factual context in which GM does not defend

16  the dealer, but only agrees to indemnify it.  The Service Manual, which is

17  incorporated by reference into the Dealer Agreement (Ex. A, Art. 17.4.3.),

18  unequivocally states that a dealer will only be reimbursed in that situation for

19  payment of a final settlement "***if such amount was approved in advance by GM***."

20  (Ex. D, Art. 7.1.4(c)) (emphasis added).  Even though this section does not apply

21  here because Old GM did agree to defend Renick, it shows that when GM intended

22  to extend its indemnification obligations to settlement, it knew how to do so, and

23  when it did so it expressly disclaimed any obligation for a settlement that it did not

24  approve in advance.  Under these circumstances, it can only be concluded that the

25  exclusion of the word "settlement" from Article 17.4 was deliberate.

26         In fact, consistent with that conclusion, Article 17.4 provides expressly that

27  the "obligations assumed by General Motors are limited to those specifically

28  described in this Article [17.4] and in the [GM Service Manual]."  Article 17.4

14

1   itself plainly does not "specifically describe" any obligation to indemnify the

2   dealership for settlements.  And, as just noted, the GM Service Manual equally does

3   not create any obligation to indemnify the dealership for settlements where, as here,

4   GM agrees to defend the dealership as opposed to authorizing the dealership to

5   defend itself.  And even if, as was not the case, GM had authorized Renick to

6   defend itself, it still would not have been liable for any settlement it did not approve

7   in advance.  Surely the plaintiff insurance companies cannot have any greater rights

8   here.

9   **II.     Plaintiffs' "Express Indemnity" Claim Similarly Fails Because the**

10           **Indemnification Provision Does Not Cover Settlements.**

11           In order to prevail on their express indemnity claim, plaintiffs must prove

12   that their loss – their $6 million payment to the *Deutsch* Plaintiffs to settle on behalf

13   of Renick – was covered by the indemnification provision, the very same thing they

14   must prove to establish their breach of contract claim.  *See Raines v. Nat'l*

15   *Emergency Servs.*, No. 189997, 1996 Mich. App. LEXIS 506, at *7 (Dec. 13, 1996)

16   (plaintiff had to establish that the contracting parties intended that defendant

17   indemnify the indemnitee for the kind of losses it suffered in order to support a

18   claim for contractual indemnification).  As shown above, plaintiffs have not and

19   cannot prove that Old GM had or New GM has any obligation to indemnify

20   Renick's insurers for their independent decision to accept the *Deutsch* Plaintiffs'

21   policy limits demand.

22           Proper analysis of this claim exactly tracks the analysis of plaintiffs' breach

23   of contract claim set forth above.  In a contractual indemnity action, the threshold

24   question of whether the fact situation is covered by the indemnity contract generally

25   requires only a straightforward analysis of the facts and the contract terms.  *Grand*

26   *Trunk W.R.R., Inc. v. Auto Warehousing Co.*, 262 Mich. App. 345, 357, 686

27   N.W.2d 756, 764 (2004); *accord Prince v. Pacific Gas & Elec. Co.*, 45 Cal. 4th at

28   1158, 90 Cal. Rptr. 2d at 737 ("Express indemnity … *is enforced in accordance*

15

1    *with the terms of the contracting parties' agreement*").  Where the parties have

2    expressly contracted with respect to the duty to indemnify, the extent of the duty

3    must be determined from the language of the contract, and this Court may not look

4    outside the contract to assess the parties' intent.  *See Grand Trunk*, 262 Mich. App.

5    at 353, 686 N.W.2d at 762 (general rules for contractual indemnity apply to claims

6    of indemnity in commercial transactions, rather than the specific rules governing an

7    insurer's duty to defend); *Martin*, 249 Mich. App. at 291, 642 N.W.2d at 702;

8    *Detroit Edison Co. v. City of Detroit*, No. 278778, 2009 Mich. App. LEXIS 1441,

9    at **10-11 (June 25, 2009).

10        Under Michigan law, indemnity contracts are construed most strictly against

11   the party seeking indemnification.  *Liberty Mut. Ins. Co. v. Curtis Noll Corp.*, 112

12   Mich. App. 182, 191, 315 N.W.2d 890, 895 (1982) (citing *Gartside v. Young Men's*

13   *Christian Ass'n*, 87 Mich. App. 335, 339, 274 N.W.2d 58 (1978), and *Robinson v.*

14   *A.Z. Shmina & Sons Co.*, 96 Mich. App. 644, 649, 293 N.W.2d 661 (1980)).

15        Further, it is well settled under Michigan law that the indemnity promised, as

16   expressed in the written contract, may not be enlarged by proof of intention outside

17   of the contract.  *Mich. Stamping*, 235 Mich. at 13-14, 209 N.W. at 107 (affirming

18   trial court's directed verdict in favor of insurer in an action by insured to require

19   insurer to indemnify it for sums it expended to settle a wrongful death lawsuit and a

20   personal injury lawsuit where unambiguous language of the policy did not cover the

21   claims asserted in the case).[6]

22

23   ─────────────────

[6]  California law is the same.  *See Rossmoor Sanitation, Inc. v. Pylon Inc.*, 13 Cal.
24   3d 622, 628, 119 Cal. Rptr. 449, 452 (1975) (in their interpretation of an express
25   indemnity contract, courts may not extend the obligation of the indemnitor beyond
     the terms of the contract, *nor may they draw from the independent doctrine of*
26   *equitable indemnity and consider equity in their interpretation*) (emphasis added);
27   *Prince*, 45 Cal. 4th at 1158, 90 Cal. Rptr. 2d at 732 ("Express indemnity generally
     is not subject to equitable considerations…; rather, *it is enforced in accordance*
28   *with the terms of the contracting parties' agreement*") (emphasis added).

16

1    The court in *Michigan Stamping* quoted a prior decision of the Supreme

2    Court of Michigan in which the court stated:  "The offered testimony was not

3    limited to showing the consideration of the contract merely, but sought to change

4    the scope and effect of the contract, and to cast upon the defendant an obligation

5    which the contract did not require of it.  The court properly rejected such

6    testimony."  *Id.* (quoting *Foley v. Railway Co.*, 168 Mich. 496, 497, 134 N.W. 446,

7    446 (1912)).

8    There is no dispute about what the Dealer Agreement says.  The obligation of

9    Old GM to indemnify Renick is set forth in Article 17.4 of the Renick Dealer

10   Agreement, which states: "General Motors will assume the defense of Dealer and

11   indemnify Dealer against any ***judgment*** for monetary damages or rescission of

12   contract, less any offset recovered by Dealer, in any lawsuit naming Dealer as a

13   defendant relating to any Product that has not been altered . . . ."  (emphasis added).

14   By the contract's clear and unambiguous terms, when Old GM agreed to defend a

15   dealership, Old GM only had a duty to indemnify the dealership for any judgment.

16   Just like in *Michigan Stamping*, plaintiffs here seek to have this Court read into the

17   Renick Dealer Agreement an obligation that is not there – an obligation to settle a

18   case upon demand, or to indemnify Renick for a settlement.  Michigan law, as well

19   as California law, is clear, however, that this Court cannot go outside the four

20   corners of the Dealer Agreement to expand Old GM's indemnification obligation to

21   Renick.  The contract's language is clear and unambiguous that Old GM will

22   indemnify Renick for ***judgments***, not settlements, especially those to which Old

23   GM did not agree.  To interpret the contract any other way would be in direct

24   contravention of well-established Michigan contract and indemnification law.

25   **III.   Plaintiffs Have No Standing to Pursue a Claim Based on Breach of**

26   **Contract or Express Indemnity.**

27   Neither Granite State nor Federal has any right under the Dealer Agreement

28   because they are neither parties to the contract nor third-party beneficiaries.

17

Therefore, they lack standing to assert any claims arising out of the Dealer Agreement.  Whether a party is a third-party beneficiary must be determined from the language of the contract **only**, *Shay v. Aldrich*, 487 Mich. 648, 664, 790 N.W.2d 629, 639 (2010), and the Dealer Agreement expressly disclaims any third-party beneficiaries.  *See* Art. 17.9.  "The mere fact that a third person would incidentally benefit does not give the third person a right to sue for the breach of contract." *Schmalfeldt v. N. Pointe Ins. Co.*, 252 Mich. App. 556, 562, 652 N.W.2d 683, 687 (2002).

When a court determines a party has no third-party beneficiary rights under a contract, that party cannot maintain an action based on that contract, whether styled as a claim for breach of contract or a claim for indemnification.  *See*, *e.g.*, *Oetting v. Nabil*, No. 187692, 1997 Mich. App. LEXIS 3536, at **5-6 (February 14, 1997) (determining that plaintiff had no third-party beneficiary rights and, thus, the trial court's grant of summary disposition on plaintiff's claim for breach of contract was proper); *Detroit Sch. Dist. v. URS Corp.*, No. 267715, 2006 Mich. App. LEXIS 2398, at **9-10 (July 27, 2006) (holding that trial court did not err in dismissing plaintiff's claim for contractual indemnification because plaintiff could not bring suit under a contract to which it was not a party and under which it did not have any third-party beneficiary rights).  Accordingly, plaintiffs' breach of contract and express indemnity claims must be dismissed as a matter of law.

## IV.   New GM is Entitled to Summary Judgment on Plaintiffs' Equitable Subrogation Claims.

As discussed above, plaintiffs' breach of contract claim fails because there has been no breach of any duty imposed by the Dealer Agreement.

Subrogation is the substitution of one person in the place of another **with reference to a lawful claim**, demand, or right, so that he or she who is substituted succeeds to the rights of the other **in relation to the debt or claim**, and its rights, remedies, or securities.  *Yerkovich v. AAA*, 461 Mich. 732, 738-39, 610 N.W.2d

18

542, 544 (2000) (emphasis added).  Equitable subrogation is "a legal fiction through which a person who pays a debt *for which another is primarily responsible* is substituted or subrogated to all the rights and remedies of the other."  *Auto-Owners Ins. Co. v. Amoco Prod. Co.*, 468 Mich. 53, 59, 658 N.W.2d 460, 463 (2003) (emphasis added).  It is well-established that the subrogee acquires no greater rights than those possessed by the subrogor, and that the subrogee may not be a "mere volunteer."  *Id.*; *Yerkovich*, 461 Mich. at 738-39, 610 N.W.2d at 544.  Indeed, an equitable subrogation claim is based on the claim that the subrogor would have had against the defendant.  *Auto-Owners Ins.*, 468 Mich. at 63-64, 658 N.W.2d at 466.

There exists no "lawful claim" for which plaintiffs can be substituted for Renick.  Plaintiffs base their equitable subrogation claim on Renick's alleged claim for breach of contract.  *See* Compl. ¶54 ("Renick has an existing, assignable cause of action for breach of contract and Granite State and Federal are subrogated to that cause of action . . . .").  Yet, as discussed above, New GM is entitled to judgment as a matter of law on the breach of contract claim.  Standing in the shoes of Renick, plaintiffs are subject to any defenses New GM would have had against Renick, and plaintiffs' equitable claim fails for the same reasons plaintiffs' breach of contract claim fails.  Equitable subrogation would only get plaintiffs into Renick's shoes, which are mired in legal quicksand.

In addition, New GM is not "primarily responsible" for the $6 million settlement the insurers paid because New GM never had any duties or obligations to Renick.  New GM did not even exist on June 1, 2009, the day that Renick's insurers settled the claims against Renick.  After June 1, 2009, there was no claim against Renick for Old GM to defend against, nor was there the potential for a judgment against Renick that Old GM would have to indemnify.  Accordingly, Old GM rendered the defense and withdrew its agreement to indemnify on June 2, 2009.

When New GM consummated its purchase of Old GM's assets on July 10, 2009, Old GM had no obligation to Renick that New GM could assume. [7]

## **CONCLUSION**

For these reasons, New GM respectfully requests this Court to grant summary judgment in favor of New GM and dismiss all of plaintiffs' claims as a matter of law.

DATED: July 30, 2012          ISAACS CLOUSE CROSE & OXFORD LLP
                              GREGORY R. OXFORD

                              By: *[s] Gregory R. Oxford*
                                  Gregory R. Oxford

_____

[7] California law sets forth specific elements that plaintiffs asserting equitable subrogation claims must establish: "(i) the insured suffered a loss for which the defendant is liable, either as the wrongdoer whose act or omission caused the loss *or because the defendant is legally responsible to the insured for the loss caused by the wrongdoer*; (ii) the claimed loss was one for which the insurer was not primarily liable; (iii) the insurer has compensated the insured in whole or in part for the same loss *for which the defendant is primarily liable*; (iv) the insurer has paid the claim of its insured to protect its own interest and not as a volunteer; (v) *the insured has an existing, assignable cause of action against the defendant that the insured could have asserted for its own benefit had it not been compensated for its loss by the insurer*; (vi) the insurer has suffered damages caused by the act or omission upon which the liability of the defendant depends; (vii) justice requires that the loss be entirely shifted from the insurer to the defendant, whose equitable position is inferior to that of the insurer; and (viii) the insurer's damages are in a liquidated sum, generally the amount paid to the insured (or adverse party asserting a claim against the insured). *Interstate Fire & Cas. Ins. Co. v. Cleveland Wrecking Co.*, 182 Cal. App. 4th 23, 32, 105 Cal. Rptr. 3d 606, 613 (2010). Under California law, plaintiffs' equitable subrogation claim would fail under subparts (i), (iii) and (v) of this test because, for the reasons set forth above, neither Old GM nor New GM was "legally responsible" or "primarily liable" for the insurers' loss and, further, because Renick does not have "an existing, assignable cause of action against [New GM]," which did not even exist at the time the plaintiff insurers agreed to settle the *Deutsch* Action, that Renick could have asserted for its own benefit had it not been compensated for its loss by the insurer." *See Ventura County Employees' Retirement Assoc. v. Pope*, 87 Cal. App. 3d 938, 952, 151 Cal. Rptr. 695, 705 (1978) ("Rights under subrogation are derivative rights, and succession to another's rights, like water, cannot rise higher than its source").

20

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KING & SPALDING LLP
PHILIP E. HOLLADAY, JR.
ROBERT B. FRIEDMAN

By: *[s] Philip E. Holladay, Jr.*
    Philip E. Holladay Jr.

Attorneys for Defendant
General Motors LLC

21

DMSLIBRARY01-19281046.1